# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:14-cr-0070 |
| | : | |
| v. | : | |
| | : | (Judge Kane) |
| **BRANDON ORR, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendants' joint motion to preclude the Government's expert witness testimony on gang identification, filed by Defendant Brandon Orr and joined by his eleven trial co-defendants. (Doc. No. 779.) Defendant Orr filed his motion and brief in support on October 4, 2015 (Doc. Nos. 779, 780), and the Government filed its brief in opposition on October 15, 2015 (Doc. No. 820). For the reasons that follow, the Court will grant the motion in part.

**I.    BACKGROUND**[1]

On September 17, 2014, a federal grand jury returned a superseding indictment consisting of six counts against twenty-one defendants, charging racketeering conspiracy, controlled substance conspiracy, and firearms offenses. (Doc. No. 78.) In the indictment, the Government alleges that the defendants were associated with the Southside gang, an alleged violent street gang in the city of York, Pennsylvania. (Doc. No. 78 ¶ 1.) The indictment charges that the defendants participated in the gang's drug trafficking and violent acts, and that the

---

[1] A more complete factual background of this action appears in the Court's previous memoranda. The Court recounts here only that background material necessary to the disposition of the present motion.

1

Southside gang affiliated with the Bloods, a national street gang. (Id.) The Government disclosed its intention to offer expert testimony about street gang practices and identification in a correspondence to counsel that, in lieu of providing formal expert reports, provided brief summaries of the testimony that each expert was expected to present and summaries of each proffered witness's qualifications. (Doc. Nos. 514-3; 514-4; 514-5.) On September 15, 2015, the Court conducted a hearing so that counsel could examine and cross-examine the Government's proffered experts about their qualifications and opinions in anticipation of a challenge to the admissibility of their testimony under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Defendants raised that Daubert challenge with the present motion.

Defendants' motion seeks the exclusion of testimony from Federal Bureau of Investigation (FBI) Special Agent John Havens and York City Police Department (YCPD) Sergeant Larry Lawrence, the Government's two purported experts on gang identification, both of whom testified at the September 15, 2015 hearing. (See Doc. No. 779.) In the motion, Defendants argue that: (1) "neither prospective witness has the knowledge, skill, experience, training or education required to qualify him to render expert opinions on gang identification or structure;" (2) "the prospective opinions of each witness regarding the identification of the Southside and Bloods gangs in the city of York are not admissible because they are not based on reliable principles or methods;" and (3) "neither witness formulated his opinion in this case by applying a definition of a gang to his observations of activities in the city of York." (Doc. No. 780 at 4-8.)

Jury selection commenced for the twelve remaining defendants on September 21, 2015, and the trial is ongoing. The Court turns to the standards governing the testimony of expert

witnesses, and then addresses Defendants' challenge to each witness.

## II. LEGAL STANDARD

The Supreme Court has held that the trial court has "a special obligation" to ensure that any and all expert testimony is not only relevant but reliable. Kumho Tire Co., Ltd., v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589). This special obligation has been likened to a "gatekeeping role" for the trial judge. Daubert, 509 U.S. at 597. Accordingly, the admission of scientific, technical, or other specialized knowledge is within the discretion of the district court. General Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997).

This inquiry is controlled by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the United States Court of Appeals for the Third Circuit has explained, these requirements represent the "trilogy of restrictions on expert testimony: qualification, reliability and fit." Calhoun v. Yamaha Motor Corp. U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (citing Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).

When considering the qualification requirement, a Court must discern whether a proffered witness has specialized expertise in a given field. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). In undertaking this inquiry, no particular background or credentials are necessary to establish specialized knowledge: "a broad range of knowledge, skills, and training qualify an expert." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). In the

3

context of law enforcement officers, the Third Circuit has held that investigative experience may qualify an officer to testify as an expert about certain topics. See e.g., United States v. Davis, 397 F.3d 173, 178-79 (3d Cir. 2005) (affirming admissibility of "fourteen-year veteran of the Philadelphia police force with twelve years of experience in narcotics" to testify regarding "the methods of operation for drug traffickers in the South Philadelphia area"); United States v. Gibbs, 190 F.3d 188, 211 (3d Cir. 1999) ("[I]t is well established that experienced government agents may testify to the meaning of coded drug language under [Federal Rule of Evidence] 702."); see also, United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008) (collecting cases).

As for the reliability requirement, the Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S at 152. The Third Circuit has recognized that the familiar Daubert reliability factors[2] have only limited applicability in the context of officer-experts testifying as to matters outside the physical sciences. See Davis, 397 F.3d at 178-79 ("[T]he factors enumerated in Daubert were intended to apply to the evaluation of scientific testimony, and they have little bearing in this case."). In Davis, for example, the Third Circuit affirmed the district court's

---

[2] The reliability factors, as recognized by the United States Supreme Court and the Third Circuit, include: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Calhoun, 350 F.3d at 321 (citing Paoli, 35 F.3d at 742 n.8).

finding that a Philadelphia police officer was qualified to testify about drug trafficking in South Philadelphia because the expert was "a fourteen year veteran of the Philadelphia police force with twelve years of experience in the narcotics division," who gained expertise about gang operations through professional experience. United States v. Davis, 233 F. Supp. 2d. 695, 701 (E.D. Pa. 2002), aff'd, 397 F.3d 173 (3d Cir. 2005). In cases like this one, "the relevant reliability concerns may focus upon personal knowledge or experience." United States v. Walker, 657 F.3d 160, 175-76 (3d Cir. 2011) (quotations and citations omitted). Given the less technical but no less searching approach necessitated by experts such as these, courts tasked with gauging the reliability of officer-experts under Rule 702's flexible standards should weigh any other factors that could potentially speak to the reliability of an officer-expert's proposed testimony. See Calhoun, 350 F.3d at 321.

      The final requirement is fit, which means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Id. (quoting Schneider, 320 F.3d at 405). This inquiry goes primarily to relevance because expert opinion which does not relate to a disputed issue is not relevant and cannot assist the trier of fact as required by Rule 702. Daubert, 509 U.S. at 591-92. Courts in the Third Circuit have long allowed experts to testify to the structure and hierarchy of relevant criminal organizations in conspiracy prosecutions. See United States v. Theodoropoulos, 866 F.2d 587, 592 (3d Cir. 1989), overruled on other grounds by, United States v. Price, 76 F.3d 526, 528-29 (3d Cir. 1996); see also United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992) ("In cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the 'modus operandi' of the drug trade.").

Ultimately, a court may find that an otherwise admissible expert opinion should be excluded under Federal Rule of Evidence 403 because its probative value is substantially outweighed by the potential danger of unfair prejudice, confusion, or misleading of the jury. See Paoli, 35 F.3d at 746-47. Therefore, the Court must have considerable discretion in deciding how to evaluate expert testimony and in determining whether that testimony is reliable and relevant. Kumho Tire Co., 526 U.S. at 152.

## III. DISCUSSION

The present motion pertains to two purported experts: FBI Special Agent John Havens, and YCPD Sergeant Larry Lawrence. (Doc. No. 779.) Defendants' motion challenges both experts on each aspect of the Third Circuit trilogy: qualifications, reliability, and fit. The Court addresses Defendant's challenge to each expert in turn.

### A. Special Agent John Havens

Special Agent John Havens has been a law enforcement officer since before 1991, and he has been a special agent with the FBI since 1999. (Doc. No. 514-4 at 3-4.) At present, Special Agent Havens is temporarily assigned to FBI headquarters as a program supervisor in the Domestic Terrorism Operations Unit. (Id. at 1.) A large part of Special Agent Havens's extensive career has been spent in gang investigation and abatement. Special Agent Havens "was previously assigned as the Unit Chief of the National Gang Targeting Enforcement Coordination Center (GangTec) . . . . In that position, [he] supervised a federal task force . . . to coordinate multi-agency, cross jurisdictional efforts to address street gangs." (Id.) His permanent assignment concerns street gang abatement with the FBI's Newark Division in the Safe Streets Division. (Id.) Special Agent Havens was also previously assigned to the FBI's

Safe Streets Gang Unit, where he investigated street gangs in the Northeast United States. (Id. at 1-2.) In addition to coursework at two police academies and the FBI Academy at Quantico, Virginia, Special Agent Havens has attended numerous training events presented by regional law enforcement agencies and associations. (Id. at 4-5.) Special Agent Havens holds a masters degree in criminal intelligence from the American Military University. (Id. at 5.) He has received numerous awards and citations and has been an instructor in gang investigations conferences and courses. (Id.) In addition, Special Agent Havens has been certified as an expert witness to testify about the Bloods street gang by at least one other district court in this Circuit. See "Jury Instructions," (Doc. No. 37 ¶ 36), United States v. Menter, No. 11-cr-0159 (D.N.J. July 13, 2011).

According to the Government's disclosure,[3] Special Agent Havens will be called to testify "regarding the Bloods as a street gang with a national presence but with distinct sets throughout the country." (Doc. No. 514-3 at 2-3.) "Special Agent Havens will provide expert opinions regarding the means of communication and self-identification used by the Bloods, including but not limited to the use of certain terminology and hand gestures." (Id. at 3.) The Government will also call Special Agent Havens to testify about Bloods identification "through analysis of communication, clothing, tattoos, and the wearing of certain colors," and he will describe initiation procedures, organizational structure, and "the evolving relationship that Blood sets in the Mid-Atlantic region have with local street gangs." (Id.) "He will opine that many of these localized street gangs develop relationships with Bloods and often over time morph into

---

[3] The Court observes that any prejudice that could have resulted to the defendants from the brevity of the Government's expert disclosures was cured by the Daubert hearing held on September 15, 2015.

Blood gangs." (Id.)

At the September 15, 2015 hearing, Government counsel elicited opinions from Special Agent Havens about the topics in its disclosure. Special Agent Havens testified that the Bloods gang is national in scope and that the national organization is divided into regional sects. According to Special Agent Havens, based on his experience, many of these regional sects began as local street gangs that developed a Bloods affiliation often as a result of prison networking. Special Agent Havens testified that the Bloods organizations often operate under a "paramilitary" leadership structure. Counsel for Defendants Cruz, Schueg, Sistrunk, Atkinson, and Williams cross-examined the witness, and all defense counsel were given the opportunity to do the same. Defendants argue that (1) Special Agent Havens is not qualified to give expert opinions about gang identification because "all of [his] experience is at its core, anecdotal," (Doc. No. 780 at 5); that (2) Special Agent Havens's opinions are not reliable because he did not provide a consistently applicable definition of "gang," and because his identification procedures were ultimately subjective, (id. at 7); and that (3) Special Agent Havens's proffered testimony lacks "fit" because his experience and testimony concerns the broader Northeast, and not York, Pennsylvania (id. at 8).

With regard to Special Agent Havens's qualifications, the Court finds that, based on his extensive experience, his specialized training, and his leadership positions within law enforcement teams devoted specifically to gang abatement, Special Agent Havens is qualified to serve as an expert witness. Except for the first nine months of Special Agent Havens's career with the FBI, he has spent his entire career at that agency identifying and investigating violent street gangs, including a stint as the chief of the National Gang Intelligence Center. He has

attended and taught numerous classes on gang identification and structure, and he has received training from two police academies from his career prior to joining the FBI, and with the FBI itself. Further, another district court in the Third Circuit has already found that Special Agent Havens is an expert in the field of criminal street gangs. The Court rejects Defendants' position that Special Agent Havens should be precluded from testifying because his opinions are based on anecdotal experience. Even if Special Agent Havens's experience could be characterized as anecdotal, a rule mandating the exclusion an otherwise qualified expert on that basis would lead to the exclusion of every officer-expert called as an expert. The Third Circuit has repeatedly rejected that position. See United States v. Gibbs, 190 F.3d 188, 211 (3d Cir. 1999).

Similarly, the Court finds that Special Agent Havens's opinions bear sufficient indicia of reliability to meet the Daubert standard. This inquiry is necessarily tied to Special Agent Havens's qualifications, which are more than adequate. Of course, the reliability factors from Daubert and Paoli have only limited usefulness here, see United States v. Davis, 397 F.3d 173, 178-79 (3d Cir. 2005), but Special Agent Havens's opinions are reliable, in part because his information and methods arose outside of a court context – specifically, during gang identification and investigation over several years. While the Court is cognizant that Special Agent Havens's opinions may not be subject to peer review and may not be the product of a testable hypothesis, the nature of the subject matter undermines the usefulness of those factors: the fact of an individual's gang membership cannot be assessed with mathematical precision, and an informed totality-of-the-circumstances approach from an expert as qualified as Special Agent Havens is likely to be as reliable or more reliable than any rigid formula. Similarly, his years of experience lead the Court to believe that his opinions about the origins and growth of the Bloods

organization will be reliable, as will his specialized knowledge of the growth of the Bloods through the penal system and their expansion in conjunction with localized groups. The Court emphasizes that the weight of Special Agent Havens's testimony and his credibility are determinations left to the jury, and so the Court makes its reliability determination as a mere gatekeeper, and not a factfinder. See Elckock v. Kmart Corp., 233 F.3d 734, 751 n.8 (3d Cir. 2000).

Agent Havens's testimony also satisfies the criterion of "fit." Essential to the Government's RICO allegation are its contentions that at least four defendants are members of the Bloods who supply the remaining gang members with drugs. (See Doc. No. 78 ¶¶ 13-14.) The Government alleges that Blood members Cruz, Hernandez, Kelly, and Villega, as Bloods, affiliated with the existing neighborhood Southside gang to their mutual benefit. These allegations are strongly contested. No defendant concedes membership in the Bloods or any other gang. Special Agent Havens's testimony regarding gang symbols and identification will assist the jury in evaluating the evidence offered to show gang membership. Special Agent Havens's testimony regarding the origins, growth, and regional integration of the Bloods organization will be helpful to the jury in understanding and analyzing weeks of testimony regarding the activities and relationships of these twelve defendants and their gang affiliates, if any.

However, some parts of Special Agent Havens's testimony at the Daubert hearing lack relevance to the present prosecution. The details of the Bloods' initiation rite, a thirty-one second beating at the hands of fellow Bloods members, bear no relationship to any particular defendant present at trial. While it may be useful as background, on the record as it now stands,

it is clear that such testimony must be excluded as substantially more prejudicial than probative. In addition, Special Agent Havens will not be permitted to testify as to any individual defendant except in the abstract, and he will not be permitted to opine as to whether any individual defendant is or is not a gang member, nor will he offer an opinion as to whether the Bloods gang and the alleged Southside gang are affiliates. While testimony on these subjects was not adduced at the hearing, and while the Government warranted that the witness would not testify as to any individuals at trial, any such testimony would transgress the division between expert and fact witnesses, would be outside of Special Agent Havens's expertise, and would be substantially more prejudicial than probative given the danger of unfairly crediting an expert's statements and the witness's confessed lack of familiarity with the individual defendants or the Southside gang. See United States v. Mejia, 545 F.3d 179, 189-193 (2d Cir. 2008).

      B.    **Sergeant Larry Lawrence**

Sergeant Lawrence joined the York City Police Department in 1999, and he currently supervises patrol officers as a sergeant. (Doc. Nos. 514-5 at 1-2; 514-6.) From 2006 until 2012, except for military deployment in 2008, Sergeant Lawrence was responsible for gang identification and the listing of gang members on the YCPD's registry. Between the years of 2006 and 2012, Sergeant Lawrence attended a number of training conferences on gang identification, although the length and intensity of those conferences varied. In addition, Sergeant Lawrence identified the fourth edition of the Gang Guidebook as the most authoritative text on gang identification. Sergeant Lawrence is a member of a number of regional gang investigation associations, including the East Coast Gang Investigators Association (ECGIA), and the Middle Atlantic Great Lakes Organized Crime Law Enforcement Network

(MAGLOCLEN). (Doc. No. 514-5 at 1.) In 2010, the ECGIA certified Sergeant Lawrence as a gang investigator after a written examination. In the course of his employment, he conducted interviews with gang members and investigated gang symbols and activities on a daily basis. While he has testified as a fact witness "more than a hundred times," he has never been offered as an expert witness. Sergeant Lawrence has already testified as a fact witness in the present trial.

According to the Government's correspondence to counsel, Sergeant Lawrence "will provide expert opinions regarding the Southside gang and the Bloods gang particularly in the context of street level activities occurring in the City of York." (Doc. No. 514-3 at 3.) At the September 15, 2015 hearing, Sergeant Lawrence testified about his experience as an investigator, as well as the structure, practices, and membership of the alleged Southside gang. He also expounded on the definition of a gang, and the criteria for listing an individual on the YCPD's gang registry. To Sergeant Lawrence's knowledge, to be included on the YCPD's gang member list, an individual has to meet three of five criteria: (1) self-identification as a gang member, (2) gang tattoos, (3) gang graffiti, (4) intelligence from law enforcement that an individual was a gang member, and (5) through observed association. An individual who self-identifies as a gang member is automatically included on the YCPD list, but in the absence of self-identification, three of the remaining four criteria have to be satisfied to list an individual. Sergeant Lawrence indicated both in his written statement and at trial that a gang is "any group of three or more people that collectively conduct crimes together for the furtherance of his/her group." (Doc. No. 514-5 at 1.) He also provided a narrative summary of how alleged Southside members and presumably members of other York area street gangs are recruited and developed. According to

Sergeant Lawrence, individuals began their gang affiliation as "whoop whoop" boys, alerting street corner drug dealers of approaching police. From there, from ages fourteen to twenty, individuals are street level drug dealers. As they age, they become more senior gang members responsible for larger scale drug trafficking, as well has wholesale drug distribution to the street level dealers.

At the hearing, counsel for defendants Orr and Schueg cross examined Sergeant Lawrence, and all defense counsel were provided an opportunity to do the same. In their supporting brief, the defendants argue that (1) the witness "clearly has law enforcement experience during a six-year period that enables him to make observations regarding activities in the city of York, but his experience does not rise to the level of 'specialized knowledge' qualifying him to offer expert opinion testimony pursuant to Fed. R. Evid. 702;" (Doc. No. 780 at 5); that (2) Sergeant Lawrence's "all inclusive definition [of a 'gang'] will permit the government to argue from his opinion that a particular confederation of criminals is a gang either because they possess a particular set of characteristics or because they do not[, and accordingly] [t]his is not the stuff of expert opinions;" (id. at 7); and that (3) the witness's "anecdotal exposure to activity in York that he defines as gang activity is not a reliable methodology upon which an expert opinion may be based;" (id. at 8).

Sergeant Lawrence is also qualified by experience and training to testify regarding local gang activity. After five years as a patrol officer in York, Pennsylvania, he joined a special unit devoted largely to gang activity where for six years he investigated and documented local gang activity on a daily basis. Through hundreds of interviews and debriefings, he developed expertise related to the identification, formation, outward symbols, and territory of neighborhood

gangs in York, Pennsylvania. Additionally, Sergeant Lawrence has attended seminars of the ECGIA and MAGLOCLEN. Clearly, Sergeant Lawrence is qualified to testify on local gang activity and his testimony would assist the jury in evaluating the evidence related to defendants' activities and associations. His testimony satisfies qualifications, reliability, and fit as it relates to local or neighborhood gangs.

To the extent that the Government is offering Sergeant Lawrence to testify regarding national gangs or generally regarding gang activity based on his training at ECGIA or MAGLOCLEN, the Court finds that the Government has failed to support such a proffer. The Government has failed to demonstrate that the witness is qualified beyond the many other law enforcement officers who have also attended ECGIA or MAGLOCLEN seminars, or that the witness will offer opinions that are not merely recitations of information provided at these seminars. Additionally, the testimony of Sergeant Lawrence on the subject of national gangs would be unnecessarily cumulative given the testimony of Special Agent Havens.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion will be granted in part as detailed in the memorandum. An order consistent with this memorandum follows.